IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
EASTERN DIVISION

- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA, :
                          :
    Plaintiff,            :
                          :
vs.                       :   Case No. 3:14-cr-00006
                          :
JESSE DEWAYNE MOORE,      :   <u>REVOCATION HEARING TRANSCRIPT</u>
                          :
    Defendant.            :
- - - - - - - - - - - - - - X

                           Courtroom, First Floor
                           U.S. Courthouse
                           131 East Fourth Street
                           Davenport, Iowa
                           Monday, March 27, 2023
                           3:55 p.m.

BEFORE:  THE HONORABLE STEPHANIE M. ROSE, Chief Judge.


APPEARANCES:

For the Plaintiff:       MATTHEW A. STONE, ESQ.
                           United States Attorney's Office
                           U.S. Courthouse
                           131 East Fourth Street, Suite 310
                           Davenport, Iowa  52801

For the Defendant:       NATHANIEL A. NIEMAN, ESQ.
                           Nate Nieman Attorney At Law
                           329 18th Street
                           Rock Island, Illinois  61201



                KELLI M. MULCAHY, CSR, RDR, CRR
                   United States Courthouse
             123 East Walnut Street, Room 115
                Des Moines, Iowa 50309

P R O C E E D I N G S

(In open court, with the defendant present.)

THE COURT: You can be seated.

We are here in the matter of United States vs. Jesse Dewayne Moore. It's Case No. 3:14-cr-6. The United States Probation Office is represented by Wesley Lane. The U.S. Attorney's Office is represented by Matt Stone; and the defendant is personally present and represented by his attorney, Nathan Nieman.

On July 17th of 2014, the defendant was sentenced for coercion and enticement of a minor. I imposed a sentence of 120 months' imprisonment to be followed by ten years of supervised release.

Supervision started on August 16th of 2022. On August 24th of 2022, Defendant disclosed to the probation office that he had found a pornographic DVD in the attic of his parents' residence and had used it to masturbate. He said he had obtained the DVD before his offense and had found it when he was cleaning up his old property. He reported that he had disposed of the disc. I didn't take any formal action at that point, and that's found at Dockets 45 and 46.

Then a couple weeks later, on September 7th of 2022, the probation office conducted an unannounced home contact at the defendant's residence. He admitted that he had recently viewed an adult pornographic DVD while his parents were out of town and

said he found the video among his dead uncle's belongings.  He said he watched the video for about ten minutes, then destroyed it.  He said he had told his parents about that incident when they returned from vacation.  He was verbally reprimanded, but no further action was taken.  That was Dockets 47 and 48.

Then on February 17th of 2023, I received a Petition for Warrant or Summons for Offender Under Supervision.  It outlined eight violations of supervised release.

The allegations include, and this is found at Docket 49, a failure to comply with sex offender treatment.  It says that on February 14th of 2023, Defendant failed a maintenance polygraph examination for sex offender treatment.  During the polygraph examination, Defendant admitted to having unauthorized contact with minors, unauthorized use of Internet devices, possession of sexually explicit pornography, and unauthorized contact with individuals on community supervision.  Defendant's disclosures were not known to the treatment provider or the probation office.

Violation No. 2 is unauthorized contact with minors.  It says on February 15th of 2023, Defendant reported to the probation office and advised he had had contact with his cousin's minor children three or four days after he had been released from prison.  He said his cousin brought the three minor children to his home to visit and he had not seen that family while incarcerated.

1     The third violation is unauthorized contact with minors.
2  It says on February 15th of 2023, Defendant reported to the
3  probation office and disclosed that he had also had contact with
4  a 2-year-old child on multiple occasions at an Alcoholics
5  Anonymous meeting held in his apartment building.  Defendant
6  lives in an apartment through Alcoholics Anonymous, and their
7  meetings are held in a conference room on the top floor of the
8  building.  Defendant described his contact with the child as
9  briefly holding the child, wiping drool from the child's face,
10 and giving the child a yogurt while the father was present.
11     The fourth alleged violation was unauthorized contact with
12 a minor.  It says on February 15th of 2023, Defendant reported
13 to the probation office and disclosed that he had attended an
14 Alcoholics Anonymous, quote, campfire, end quote, meeting at a
15 member's home.  There was a minor female at the meeting with her
16 parent.  Defendant advised he participated in a volleyball game
17 with the minor and other adults.  He estimated the minor to be
18 13 or 14 years old.
19     The fifth violation is unauthorized use of Internet
20 devices.  It says on February 15th of 2023, Defendant reported
21 to the probation office and disclosed that he had used his
22 mother's cell phone to receive emails and play video games.
23 Defendant advised his mother was present while he used her
24 device.  The probation office did not approve Defendant using
25 this device.

1      The sixth violation is unauthorized use of Internet
2 devices.  It says on February 15th of 2023, Defendant reported
3 to the probation office and advised he used his mentor's
4 computer to fill out applications for college.  Defendant
5 advised his mentor was present while he used his computer.  The
6 probation office did not approve the defendant to use this
7 device.
8      The seventh violation is unauthorized association.  It says
9 on February 15th of 2023, Defendant reported to the probation
10 office and advised he provided transportation for individuals
11 residing at the residential reentry center in Davenport, Iowa.
12 He said he met individuals while at work and started providing
13 them with transportation.  The individuals had prior felonies,
14 and he was prohibited from having contact with them.
15      The eighth violation is possession of sexually stimulating
16 pornography.  It says on February 15th of 2023, Defendant
17 reported to the probation office and disclosed he audio-recorded
18 himself masturbating and sent the recordings to three adult
19 women.  Defendant advised the same three women audio-recorded
20 themselves masturbating and sent the recordings to him.
21      Mr. Nieman, how -- or what is the defendant's position with
22 respect to the violations alleged in the petition found at
23 Docket 49?
24         MR. NIEMAN:  Your Honor, Mr. Moore is admitting to
25 violations 1 through 8 contained in the revocation petition.

1    THE COURT: All right. Mr. Stone, in light of that
2  stipulation, any additional evidence you wish to offer?
3    MR. STONE: No, Your Honor.
4    THE COURT: All right. Then I will find by a
5  preponderance of the evidence that the defendant has violated
6  the terms and conditions of his supervision as set forth in the
7  petition at Docket 49, violations 1 through 8. These are all
8  Grade C violations. None of them mandate revocation.
9  Revocation is permissive.
10   Defendant was a Criminal History Category III at the time
11 of his original sentencing hearing, so the advisory guideline
12 range here would be 5 to 11 months' imprisonment.
13   Mr. Stone, what are you suggesting as an appropriate
14 resolution here?
15   MR. STONE: Your Honor, the Government's recommending
16 the Court revoke his supervised release and then impose a
17 sentence of six months to be served at the Bureau of Prisons and
18 then be placed back on supervised release, Your Honor.
19   This is his first formal violation; however, as the Court
20 noted, there are eight violations that are all pretty serious.
21 It seems Mr. Moore has a habit of self-reporting these things to
22 Probation but then not, I guess, internalizing that he needs to
23 still then comply with the terms of supervised release. So
24 hopefully a term at the Bureau of Prisons will help him realize
25 that he needs to comply with all the terms of his supervised

1 release, Your Honor.

2 THE COURT: Thank you.

3 Mr. Stone, it looked to me like on Iowa Courts Online, at
4 least, that Defendant's case, new criminal case, that was
5 charged in Scott County has a trial coming up on April 17th. Do
6 you know anything more about the status of that case?

7 MR. STONE: I apologize, Your Honor. I do not know
8 anything beyond that there is the new trial setting of that
9 date.

10 THE COURT: Okay. Mr. Nieman, what's your suggestion
11 here?

12 MR. NIEMAN: Your Honor, I can also address that
13 question during my argument, if you wish.

14 THE COURT: Go ahead.

15 MR. NIEMAN: Your Honor, because the minimum guideline
16 term is between one to six months, we're asking that Mr. Moore's
17 supervised release be modified to a period of community
18 confinement under 7B1.3(c)(1).

19 The reason being is that Mr. Moore was released from prison
20 on August 16th of 2022. Before he was released, when he was
21 doing the paperwork for the halfway house, then he discovered
22 the existence of the warrant for the Scott County case, which,
23 in speaking to Mr. Moore, the alleged offense conduct from that
24 state court case dates back to 2010.

25 So for whatever reason, that case was either charged or

remained pending while his federal case was pending, so they didn't let him go to the halfway house because he had a warrant. So he was released on August 16th of 2022, but he was released to his mother's home in Muscatine. He wasn't released to a halfway house.

He immediately turned himself in, and his family posted a $10,000 bond on the state court case. That is set for pretrial tomorrow. So I wanted to make the Court aware that that case is not something new. That has -- that's from a long time ago that's popped up and is messing up a number of things here, not least of which was the halfway house.

The reason why I'm suggesting that and why I believe that it's appropriate is that Mr. Moore never had that transition period from full incarceration to full freedom, essentially, or curtailed freedom on supervised release. And I think -- and the reason that he didn't was because of that warrant, not because that wasn't something that he was willing to do or there wasn't bed space or whatever.

So he's trying to take care of this state court case. He's living in this sober living home instead of the halfway house, and he's making mistakes there. He's, you know, going to these events upstairs for NA, AA, EA -- which I guess is emotional anonymous -- going to these events there, and, according to Mr. Moore, sometimes children are present at these events because parents can't find child care or whatever. And so he's

1  going to these meetings and, obviously, having these contacts
2  with children, which he's prohibited from doing.
3      I just think that giving Mr. Moore an opportunity to say,
4  look, you know all the rules, you know, we're going to give you
5  more structure than you were initially given, and coming out of
6  that initial -- that additional structure, you're on notice that
7  any contact that you have with a child is going to send you.
8      And I think that, you know, given that this is his first
9  violation that it would be appropriate to give him that chance
10 to get the structure that he didn't initially get; to allow him
11 to continue his therapy at Vera French and allow him to continue
12 volunteering at the Carol Center, where he serves lunch and
13 cleans up and moves furniture; and, importantly, allow him to
14 finish up this Scott County case, which is going to plague him.
15 If it resulted in the initial report, it resulted in him not
16 getting into the halfway house, it's just going to be an issue.
17      So I think that that is the appropriate sentence here, so
18 we would ask for that modification.
19      Thank you.
20          THE COURT:  Thank you.
21      I do want to be clear.  His guideline range is not 1 to 6.
22 It's 5 to 11.
23          MR. NIEMAN:  Right.  And the 1 to 6 that I was talking
24 about is if the minimum guideline term is between 1 and 6
25 months, which 5 and 11 is between 1 and 6 --

1    THE COURT:  Oh, I see.  Yes.  I understand.
2    MR. NIEMAN:  -- then that section would be invoked.
3    THE COURT:  Mr. Moore, is there anything you'd like to
4 say at this time?
5    THE DEFENDANT:  Yes, Your Honor.
6       First, I'd like to take responsibility for my actions and
7 behaviors.  It's been a long time that I was in prison, and I
8 deserved it, but I'm not the same man that I was when I went in.
9 I figured that these rules that I was breaking wasn't because I
10 was out to do something deviant or mischievous or nefarious.  I
11 was just trying to live a normal life that I have wanted so
12 much.
13       A lot has happened since I was incarcerated.  I did sex
14 offender treatment residential, and I completed that program.
15 Not only did I complete that program, but I excelled to help
16 others in that program where I became self-maintenance and
17 mentored other inmates.  And I also taught a boundaries classes
18 for four cycles, which is about nine months, to help people grow
19 and understand why they did these things and how to change it.
20       I can't take back what I did in my past, as much as I wish
21 I could.  It's just not possible.  But all I can show is who I
22 am today and how I can be a part of society.  I'm not a danger
23 to anybody.  I'm sorry I broke the rules, and I'm ready to
24 step toe [sic] the line because prison scares me; not because
25 I'm scared of being assaulted again or what I would have to go

1  through, but the problems it caused me mentally having to be
2  around others that don't want to change and having to deal with
3  that.
4     Right now I do volunteer my time, and I was also chairing
5  AA on Thursday nights where there's usually not a child.  You
6  know, and I just got on to the AA board at Blandine too.  I
7  wouldn't have all the support that I have in my corner from
8  church, my mother, my family and friends, people at work who
9  even notice how well I do, if I was the same person I used to
10 be.
11     You know, if I'm allowed to go home today, I promise to
12 step toe the line, that this is a wake-up call to me that this
13 isn't -- this is serious and it's no joke, I have to do what I'm
14 told or else I can lose everything again.
15     I don't want to end up like my father, who spent more than
16 half his life in prison, where I hated him so much that I
17 wasn't -- I felt that I wasn't important.  And I don't want my
18 son to see that.  And I don't want to end up self-medicating
19 myself again like my father did before he took his life.
20     A lot has happened to me, and I'm scared of prison.  I'm
21 scared of losing everything.  And I promise if I can just go
22 home, get a job again, I will contact my PO all the time, I will
23 talk in treatment.  I'd really like to still see my therapist
24 every other week because we just started to work on some of the
25 stuff that happened to me in the past.

1   I promise -- and if I could, I would help put other people
2   away that do these things so it could create less victims in the
3   world, because that was the goal of treatment was to create no
4   more victims.
5   You know, my life has changed severely, and I'm really so
6   mad at myself for disappointing everybody, but I'm proud of
7   myself today because I know I've changed and I know I can be a
8   person that helps others, that is seen highly, and that is a
9   form of society who pays bills and taxes.
10  I'm just asking for one more chance, and I promise nobody
11  will be disappointed. I just want to go home, I want to work,
12  and I just want to be a citizen.
13          THE COURT: All right. I want to talk to you about a
14  couple things that the probation officer has advised me of, and
15  I'll give you a chance to dispute whether this is accurate
16  information or not.
17  But you spoke about church. I understand that you were
18  kicked out of the LDS church while you were on supervision
19  because you essentially were soliciting sexual videos from
20  church members, including your best friend's wife, who had to go
21  to the church and was suicidal because of this behavior that you
22  had instigated with her.
23  I understand that when your father committed suicide, you
24  sent out notices to women saying your father committed suicide,
25  and then when they responded with sympathy, you solicited or

1  attempted to solicit sexual favors from them.
2       And I understand that everything that we've talked about
3  today by way of violations were only brought to our attention
4  when you failed a polygraph, not because you were being honest
5  about what was going on, and that your reaction to these
6  problems was sort of, you know, "None of this is really my
7  fault.  None of this is really a big deal."
8       So your statement that you've changed and that you're a
9  leader in these areas and that you don't need to go back to
10 prison isn't really consistent with that information.  So I'm
11 going to give you a minute to talk to your lawyer about whether
12 that's true and whether you want any testimony about it, but
13 I've got some real concerns about the predatory behavior I'm
14 seeing here and your inability to be honest about it and what
15 that might mean for your future supervision.
16      So why don't you talk with Mr. Nieman, and then we'll see
17 if you want to take any testimony on that information or if you
18 deny that it's true, and then we'll talk a little bit more.
19      So why don't we take a 15-minute break here, and then we'll
20 come back.
21      (Recess at 4:13 p.m. until 4:19 p.m.)
22           THE COURT:  Thank you.  You can be seated.
23    Mr. Nieman, did you want to take any evidence on those
24 issues?
25           MR. NIEMAN:  Your Honor, we are not going to dispute

the allegations that the Court has just, I guess, introduced.

THE COURT: Okay. Then in this case, I have considered all of the factors under 3553(a) and the advisory guidelines and the statutory penalties.

The defendant is a very high-risk offender. His underlying case was very egregious. It involved the defendant posing as a 14- or 15-year-old boy online, posting sexually graphic images on his profile, meeting a 13-year-old girl, coercing her into meeting him in a public library where he had her perform oral sex on him which he then photographed and distributed. The victim's mother discovered the abuse of the daughter, and the victim ended up slitting her wrists as a result.

The defendant has a serious history of sexual dysfunction and sexual issues. He has acknowledged the sexual abuse of a number of victims, hands-on victims. He is an admitted sex addict whose addiction is far reaching and includes thousands of dollars in sex line calls; at least 46 known adult partners, male and female; and an addiction to all forms of pornography. He's had serious mental health struggles.

And so he is somebody who, for understandable reasons, we are keeping highly monitored, and he is somebody for whom those monitoring decisions are important to community safety and to him.

The fact that, despite the very high level of supervision he's being given, all of these problems have occurred, some of

them within mere days of him being released from prison, and the fact that a number of them happened with his family's either permission or encouragement, is disturbing to me.

That the mom is giving him her phone when she knows that he can't use it, that the family is planning reunions with children who they all know he can't be around, that his stepdad is letting him live in a place where children regularly visit, you know, these are problems, and they are not ones that I can overlook because of the defendant's very serious history.

Now, was it a long time ago? Yep. You know, Defendant's underlying offense happened, you know, almost ten years ago at this point. I believe that he can grow and change, but his behavior on supervision so far has not particularly demonstrated that.

So I do choose to revoke Defendant's term of supervised release. I impose six months of imprisonment. That will be followed by ten years of supervised release.

As far as conditions of supervision go, I'll be reimposing all of the conditions previously imposed but updated slightly to reflect the more modern language, I guess, that we utilize.

But just to go over them again while Defendant is here and his mother is here, Defendant may not have any contact with the victim of his federal offense or the victim's family without permission from the probation office.

He has to participate and follow the rules of a sex

1  offense-specific treatment program.  He's going to be subject to
2  periodic polygraph testing.
3      At this point, we have deferred his sexual history
4  polygraph because of concerns that it may implicate Fifth
5  Amendment concerns in relation to the state trial that's set to
6  begin in a couple weeks here.  But once that trial is over,
7  we'll want to get a sexual history polygraph from the defendant
8  so that we can do a better job of kind of understanding what his
9  supervision needs and treatment goals will be.
10     But he'll be subject to periodic maintenance polygraphs in
11 the meantime, as he has already had at least one in this case,
12 and he is prohibited from having any contact of any type with
13 any child without the permission -- the prior permission of the
14 probation office.
15     Now, he can't have any kind of pornography.  That's more
16 thoroughly defined by the statutes and the sentencing order
17 here.
18     He can't have any kind of camera, including any kind of
19 camera in a cell phone or any other kind of recording device,
20 video recording device.  He has to comply with sex offender
21 laws.
22     He can't have access to the Internet or any kind of
23 Internet-capable devices without permission from the probation
24 office.  If he's allowed to utilize those kinds of devices, he
25 has to agree to periodic searches of those devices, he has to

1  agree to monitoring software and hardware, the occasional
2  removal of those items for a more thorough inspection.
3      Defendant will participate in testing and treatment for
4  substance abuse.  He's prohibited from using alcohol of any
5  type, in any amount while under supervision.  He can't be in
6  places that make most of their money from the sale of alcohol.
7  That includes bars, pubs, taverns, liquor stores.
8      He's going to do cognitive behavioral treatment
9  programming.  He'll have a mental health evaluation and any
10 follow-up treatment that's recommended.  He has our standard
11 search condition.
12     And once he finishes the six-month term of imprisonment,
13 he'll go to a residential reentry center for up to 120 days to
14 help get him a job, get him a place to live.  He cannot return
15 to the current residence.  That's been a source of a number of
16 problems.  There are people in that area that are both, you
17 know, prohibited because of criminal background, they are
18 vulnerable because of certain issues going on in their lives.
19 There are children there.
20     He can certainly attend appropriate meetings, but he
21 shouldn't be certainly touching any children.  He shouldn't be
22 around any children.
23     But this particular living location is not suitable to him,
24 and so we need to find him an approved residence somewhere else.
25     Mr. Moore, you have a right to appeal this revocation.  If

you decide you want to appeal, just let Mr. Nieman know. He'll file the paperwork for you. It won't cost you anything. He would handle your appeal. That would be free for you as well.

If a notice of appeal is not filed in the next 14 days, you forever give up your right to challenge this revocation sentence.

Mr. Lane, anything else to clarify here?

THE PROBATION OFFICER: No, Your Honor.

THE COURT: Mr. Stone?

MR. STONE: No, Your Honor. Thank you.

THE COURT: Mr. Nieman?

MR. NIEMAN: No, Your Honor. Thank you.

THE COURT: Mr. Moore, do you have any questions?

THE DEFENDANT: I have statements but no questions, ma'am.

THE COURT: Okay. Then we are adjourned.

(Proceedings concluded at 4:26 p.m.)

19

1                        C E R T I F I C A T E

2        I, Kelli M. Mulcahy, a Certified Shorthand Reporter of the

3   State of Iowa and Federal Official Realtime Court Reporter in

4   and for the United States District Court for the Southern

5   District of Iowa, do hereby certify, pursuant to Title 28,

6   United States Code, Section 753, that the foregoing is a true

7   and correct transcript of the stenographically reported

8   proceedings held in the above-entitled matter and that the

9   transcript page format is in conformance with the regulations of

10  the Judicial Conference of the United States.

11       Dated at Des Moines, Iowa, this 1st day of May,

12  2023.

13

14                                 _____
                                   Kelli M. Mulcahy, CSR, RDR, CRR
15                                 Federal Official Court Reporter